**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

KATHLEEN KANE,

       Plaintiff-Relator,

v.                                                    Case No: 8:21-cv-1050-CEH-TGW

SELECT MEDICAL
CORPORATION, SELECT
PHYSICAL THERAPY HOLDINGS,
INC. and SELECT EMPLOYMENT
SERVICES, INC.,

       Defendants.
_____/

## **O R D E R**

This matter comes before the Court on Defendants' Motion to Dismiss Relator's Third Amended Complaint (Doc. 116). In the motion, Defendants request dismissal of the Third Amended Complaint with prejudice because it fails to allege Relator's False Claims Act claims with particularity as required by Rule 9(b). Plaintiff/Relator Kathleen Kane responded in opposition (Doc. 119). The United States filed a Statement of Interest Regarding Defendants' Motion to Dismiss (Doc. 129), to which Defendants (Doc. 132) and Relator (Doc. 136) replied. The Court, having considered the motion and being fully advised in the premises, will grant Defendants' motion, in part, to the extent that Counts IV, V, and VI of the Third Amended Complaint will be dismissed with prejudice. Additionally, to the extent the Third Amended Complaint seeks to sue Defendants on a nationwide basis, a

nationwide claim has not been adequately pleaded and is subject to dismissal. Defendants' Motion to Dismiss Relator's Third Amended Complaint is otherwise denied.

## I.   THE FALSE CLAIMS ACT

This is a False Claims Act or "*qui tam*" action. The False Claims Act ("FCA") allows a private party, referred to as a "relator," to file an action on behalf of herself and the United States against entities that have defrauded the government and to share in any recovery if an action is successful. 31 U.S.C. §§ 3730(b), (d). "The FCA is designed to protect the Government from fraud by imposing civil liability and penalties upon those who seek federal funds under false pretenses." *United States ex rel. Lesinski v. S. Fla. Water Mgmt. Dist.*, 739 F.3d 598, 600 (11th Cir. 2014).

## II.   BACKGROUND[1]

Plaintiff/Relator Kathleen Kane ("Relator" or "Kane") sues Defendants, Select Medical Corporation ("SMC"), Select Physical Therapy Holdings, Inc. ("SPTH"), and Select Employment Services, Inc. ("SES") (collectively "Defendants"), for alleged fraud on the government in violation of the FCA, 31 U.S.C. §§ 3729–33. Doc. 111. In a six-count Third Amended Complaint, Relator alleges Defendants engaged in an

---

[1] The following statement of facts is derived from the Third Amended Complaint (Doc. 111), the allegations of which the Court must accept as true in ruling on the instant Motion to Dismiss. *Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir. 1992); *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp. S.A.*, 711 F.2d 989, 994 (11th Cir. 1983); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

"upcoding scheme" in violation of 31 U.S.C. § 3729(a)(1)(A) (Count I); § 3729(a)(1)(B) (Count II); and § 3729(a)(1)(G) (Count III). Relator also alleges Defendants conducted an "unskilled services scheme" in violation of § 3729(a)(1)(A) (Count IV); § 3729(a)(1)(B) (Count V); and § 3729(a)(1)(G) (Count VI). *Id.* The FCA prohibits the submission of false or fraudulent claims and false statements in order to obtain or keep federal money. *Id.* ¶ 33. In sum, Relator contends that Defendants represented to the Government that they had provided more physical therapy services—in quantity and quality—than they, in fact, provided, and as a result, the Government paid Defendants higher amounts than they were owed.

Defendants move to dismiss the Third Amended Complaint with prejudice for failing to allege her claims with particularity as required by Federal Rule of Civil Procedure 9(b). Doc. 116. The United States declined to intervene. Doc. 26.

Relator is a licensed physical therapist and certified athletic trainer with over thirty years of professional experience. Doc. 111 ¶ 2. She began working for Select Physical Therapy on July 28, 2014, in Connecticut. *Id.* She relocated to Select Physical Therapy's Carrollwood Tampa location in August 2015 and worked there until she resigned on September 3, 2020. *Id.* Prior to working with Defendants, Relator oversaw billing operations and audit functions for 14 years with another company as its Director of Physical Therapy. *Id.* ¶ 3. In that role, Relator received training and practical experience on how Medicare bills are submitted electronically using codes. *Id.*

3

Defendants are Delaware corporations who share common ownership, financial control, headquarters location, management, and operational control. *Id.* ¶¶ 5–9. Relator alleges that SMC, SPTH, and SES operate with a sufficient degree of unity in the management of the Select Physical Therapy facilities in the metro-Tampa, Florida, area to present themselves as a single company to third parties. *Id.* ¶ 10. Defendants operated as a single or integrated employer. *Id.* ¶ 11. Alternatively, Relator alleges Defendants operated as a joint employer or shared agency relationship. *Id.* ¶¶ 12, 13.

Relator alleges that from 2016 to the present, Defendants knowingly submitted false and/or fraudulent claims for physical therapy services provided to individuals covered under Medicare and other Federally Funded Payors ("FFP"). *Id.* ¶ 43. Relator directly observed the actual submission of claims and government payments in the course of her normal duties working for Defendants. *Id.* ¶ 42. Relator alleges that Defendants engaged in illegal practices under the FCA, including (1) fraudulently upcoding for direct therapy (one-on-one) when group therapy was provided or by overbilling for direct therapy; and (2) fraudulently billing for "unskilled" physical therapy services not eligible to receive reimbursement. *Id.* ¶ 43.

Direct physical therapy pertains to a physical therapist, or physical therapist assistant working under the supervision of a physical therapist, working one-on-one with a patient. *Id.* ¶ 88. These services are billed in fifteen-minute intervals (constituting one unit) based on the number of times the service is provided, with a minimum length of time for one unit being at least eight minutes of one-on-one contact between the

4

physical therapist and the patient. *Id.* ¶ 91. Alternatively, group therapy sessions— which are billed and coded differently—occur when a physical therapist simultaneously treats two or more patients, regardless of whether it is the same activity and one-on-one contact is not required. *Id.* ¶ 92. Only one unit of group therapy may be billed per patient regardless of the time spent providing group therapy. *Id.* ¶ 93. A therapist may bill for both direct and group services provided to the same patient on the same day provided: (1) CPT and CMS rules for direct and group therapy are complied with; (2) group services are performed distinctly and independently from the direct services; and (3) group services are billed using a -59 modifier. *Id.* ¶ 94.

CPT ("Current Procedural Terminology") codes provide health professionals with a uniform language for describing medical services. Doc. 116 at 8 n.1. CPT codes 97140, 97112, and 97530 are codes used for physical therapy services that require one-on-one contact. Doc. 111 ¶ 90. CPT code 97150 applies to group therapy sessions. *Id.* ¶ 93. A therapist would use the -59 modifier to bill for both group therapy and individual therapy CPT codes to distinguish that the two coded services represent different sessions or separate encounters on the same day. *Id.* ¶ 95.

Relator alleges that Defendants engaged in a scheme of "upcoding" by routinely submitting false claims for reimbursement to Medicare and other FFPs for direct physical therapy services when group therapy was provided. *Id.* ¶¶ 96–97. Defendants carried out this upcoding scheme by scheduling, encouraging, and incentivizing their physical therapists to intentionally provide physical therapy to multiple patients at the same time and then bill these services as direct, rather than group, therapy. *Id.* ¶¶ 98–

99. This practice caused Medicare and other FFPs to over-pay for direct services that had not actually been performed. *Id.* ¶ 100.

Relator alleges Ms. Rita Booth, the Director of Defendants' Carrollwood clinic, routinely scheduled multiple patients with overlapping time slots and then billed only for direct therapy or for both direct therapy and group therapy, despite treating multiple patients at the same time. *Id.* ¶¶ 101–02. This resulted in Ms. Booth both failing to bill group therapy at times and overbilling for direct therapy. *Id.* ¶ 103. By way of example, on September 19, 2018, Ms. Booth billed Patients 14, 15, 16, 17, 18 and 19 for direct therapy services during the same units of time, meaning physical therapy services were being provided simultaneously with other patients. *Id.* ¶ 104. Relator alleges that similar fraudulent billing practices occurred on November 15, 2018 and November 19, 2018, in which Ms. Booth treated more than one patient at a time but coded and billed the time for direct therapy. *Id.* This practice violates CMS guidelines on Medicare billing which provides that a therapist cannot bill different patients for therapy services requiring direct one-one-one contact in the same unit of time. *Id.* ¶ 105. Relator alleges that these improper billing practices were the result of Defendants' systemic and continuing billing upcoding scheme. *Id.* ¶ 106.

Ms. Amy Shehadeh, a physical therapist at Defendants' Carrollwood clinic, also overbilled for direct services despite treating multiple patients at the same time. *Id.* ¶ 107. For example, Ms. Shehadeh engaged in upcoding on November 8, 2019, and August 18, 2020, when she billed two different patients on these dates for direct therapy services during the same units of time. *Id.* Additionally, Mr. Cameron Moore,

6

an employee at Defendants' Northdale and other clinics, overbilled for direct services when treating two patients at the same time on June 24, 2020, and June 25, 2020. *Id.* ¶ 108. For each of the referenced examples of alleged upcoding, Relator attaches to the complaint the "Daily Notes" signed by the physical therapist and identifying the services performed for the respective patients on the above-referenced dates. *See* Doc. 110-1.

Relator alleges that Defendants submitted false claims to Medicare seeking reimbursement for more direct physical therapy services than were actually provided, in violation of Medicare reimbursement rules. Doc. 111 ¶ 112. Through her experience, knowledge, training and access to Defendants' electronic medical record ("EMR") system, Relator knows that each example cited above of fraudulent coding and billing to Medicare was actually presented to Medicare for payment. *Id.* ¶ 113. By way of example, Relator attaches a printout of the billing summary ("entitled Patient Statement Inquiry") for Patient 60, one of the patients treated by Ms. Booth on November 15, 2018, and November 19, 2018. *Id.* ¶ 114; *see also* Doc. 110-2 at 8-13. The Patient Statement Inquiry ("PS Inquiry") lists CPT codes, descriptions, units billed, and amounts Defendants charged to Medicare for Patient 60 from July 24, 2018 through July 15, 2019. *Id.* ¶ 115; *see also* Doc. 110-2 at 8–13. The billing summary also details the dates and amounts Medicare paid, through payment processors like First Coast Service Options, for the services charged by Defendants. Doc. 111 ¶ 116; *see also* Doc. 110-2 at 10–11. The billing summary shows that on both November 15 and November 19, 2018, Defendants charged Medicare for two units of direct therapy and

7

one unit of group therapy provided to Patient 60 on those dates. *See* Docs. 111 ¶ 117; 110-2 at 10; 110-1 at 31–33 and 64–66. Thus, Relator alleges the billing summary shows, as to Patient 60, that Defendants fraudulently charged for direct therapy when they should have only charged for group therapy under the Medicare rules since Ms. Booth was treating Patient 60 in a single session simultaneously with other patients. Doc. 111 ¶¶ 119, 120. The upcoded billing resulted in Defendants overcharging Medicare. *Id.* ¶¶ 121, 122. The billing summary reflects that Medicare actually paid the charges submitted, as well as other charges submitted on behalf of Patient 60 for November 2018. *Id.* ¶¶ 123–28.

Regarding the alleged "unskilled services" theory, Relator alleges that Medicare only covers "skilled" physical therapy services, which are those medically reasonable and necessary, and which are performed or supervised by a qualified physical therapist. *Id.* ¶ 132. Medicare does not cover "unskilled" physical therapy services. *Id.* Physical therapy services are considered "unskilled" if the amount, frequency, and duration of the services are not reasonable under accepted standards of medical practice. *Id.* ¶ 133. Repetitive exercises are generally considered unskilled. *Id.* Rehabilitation physical therapy services are considered unreasonable and unnecessary if "an individual's expected rehabilitation potential is insignificant in relation to the extent and duration of therapy services required to achieve such potential." *Id.* ¶ 117 (quoting Medicare Benefit Policy Manual, Chapter 15 § 220.2(C)).

Relator alleges that Defendants systematically billed Medicare for unskilled physical therapy services that were ineligible for reimbursement because Defendants'

physical therapists at the Carrollwood clinic provided unreasonable services in terms of amount, frequency, and duration to many patients without justification for why these services were medically reasonable or necessary. *Id.* ¶¶ 135–36. Relator alleges that she directly observed submission and payment of the claims in the normal course of her duties working for Defendants. *Id.* ¶ 137. For example, Ms. Booth provided rehabilitative therapy on an FFP-covered patient 139 times over the course of twenty months. *Id.* ¶ 138. She attaches the treatment records in support. *See* Doc. 110-5. Several other physical therapists employed by Defendants performed rehabilitative therapy on a 94-year-old FFP-covered patient 161 times over the course of twenty-one months. Doc. 111 ¶ 139; *see also* Doc. 110-6. Relator alleges that neither patient showed justification for the significant length of this treatment, nor showed significant progress, making their continued treatment unjustified. Doc. 111 ¶ 140. Relator asserts that her education, knowledge, experience, training, personal observations and access to Defendants' EMR, coding, and billing system confirms that the unskilled services scheme was rampant and the fraudulent charges were actually submitted to and paid by Medicare. *Id.* ¶ 141.

Relator quotes from specific emails dating back to 2016 that include references to performance incentives for employees to avoid "group" billing as evidence that Defendants attempted to incentivize employees to upcode billings under the guise of productivity improvement. *Id.* ¶¶ 142–44, 146–48. Defendants incentivized upcoding by suggesting bonus payments for productivity. *Id.* ¶¶ 145–46.

On November 16, 2018, Relator informed Defendants' Chief Compliance Officer, Mr. Robert G. Breighner, Jr, of Ms. Booth's fraudulent billing practices, providing Mr. Breighner with approximately 185 examples of Ms. Booth's fraudulently submitted bills in less than two months. *Id.* ¶¶ 156–58. Afterwards, Relator spoke with Ms. Cheryl Salerno of Mr. Breighner's staff regarding concerns Relator identified on several other occasions. *Id.* ¶ 159. Despite this, Ms. Booth was only required to make addendums to the bills that Relator had sent to Mr. Breighner, and Mr. Breighner did not conduct a full chart review of Ms. Booth's activity months after Relator's initial report. *Id.* ¶¶ 164–65. Rather, billing corrections were only made within the narrow timeframe Relator gave to Mr. Breighner. *Id.* ¶ 165.

Additionally, in March 2019, Relator informed Mr. Maduro, Defendants' Market Manager, of Ms. Booth's fraudulent billing practices who, in response, told Relator to stop auditing patient documentation for whom she is not the treating clinician. *Id.* ¶¶ 161–63. Ms. Booth confirmed this billing activity in a conversation in which she stated, "this is how I was taught to bill" and that she "did not believe in group billing." *Id.* ¶ 166. Despite Relator's notice of unlawful billing practices to Defendants' Compliance Officer and management, Defendants submitted these false claims. *Id.* ¶ 168.

Relator alleges Defendants engaged in a nationwide scheme to defraud the government through these billing practices given that she gave notice to Defendants on a local, regional, and national basis. *Id.* ¶ 169.

Defendants expressly certified compliance with the FCA when they submitted Medicare cost reports based on their claims to Medicare, as well as documents that contain certifications of compliance to the government as a condition of receiving Medicare reimbursements. *Id.* ¶¶ 171, 173, 176. As a result, Medicare paid Defendants higher amounts than they were owed, causing damage to the Government Payors. *Id.* ¶¶ 182, 183.

## III.    LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a pleading must include a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). Labels, conclusions and formulaic recitations of the elements of a cause of action are insufficient. *Id*. (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Furthermore, mere naked assertions are not enough. *Id*. A complaint must contain sufficient factual matter, which, if accepted as true, would "state a claim to relief that is plausible on its face." *Id*. (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citation omitted). The court, however, is not bound to accept as true a legal conclusion stated as a "factual allegation" in the complaint. *Id*.

Additionally, Federal Rule of Civil Procedure 9(b) places more stringent pleading requirements on claims alleging fraud. Fed. R. Civ. P. 9(b). "[U]nder Rule

11

9(b) allegations of fraud must include facts as to time, place, and substance of the defendant's alleged fraud." *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1308 (11th Cir. 2002) (citation and internal quotations omitted). Plaintiffs are thereby required to set forth "the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009) (internal quotation marks omitted) (citing *Clausen*, 290 F.3d at 1310). Failure to satisfy the particularity requirement under Rule 9(b) amounts to failure to state a claim under Rule 12(b)(6). *See, e.g., Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005).

## IV.    DISCUSSION

### A. Particularity Requirement under Rule 9(b)

In their motion to dismiss the Third Amended Complaint, Defendants argue that Relator still fails to plead her claims with the particularity required under Federal Rule of Civil Procedure 9(b). To state a claim in an action under the False Claims Act, Rule 8's pleading standard is supplemented but not supplanted by Rule 9(b)'s pleading requirements. *See Clausen*, 290 F.3d at 1309.  In pertinent part, Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud," but scienter may be alleged generally. To satisfy this heightened-pleading standard in an FCA action, the Relator must allege "facts as to time, place, and substance of the defendant's alleged fraud," particularly, "the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Id.* at 1310 (quoting

*Cooper v. Blue Cross & Blue Shield of Fla.*, 19 F.3d 562, 567–68 (11th Cir. 1994)) (internal quotation marks omitted).

### B. Upcoding Theory

1.     Count I—Violation of 31 U.S.C. § 3729(a)(1)(A)

In Count I, Relator alleges Defendants engaged in an "upcoding scheme" in violation of 31 U.S.C. § 3729(a)(1)(A) by presenting for payment to the Government false or fraudulent claims for direct therapy services when group therapy services were provided, which resulted in Medicare overpaying. In their motion to dismiss, Defendants challenge the sufficiency of Relator's presentment and falsity allegations in Count I. Doc. 116 at 6–18. To state a § 3729(a)(1)(A) presentment claim in this Circuit, "a complaint must allege (1) a false claim, (2) that the defendant presented, or caused to be presented, for payment or approval, (3) with knowledge that the claim was false." *United States ex rel. 84Partners, LLC v. Nuflo, Inc.*, 79 F.4th 1353, 1359 (11th Cir. 2023) (citing *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1154 (11th Cir. 2017)).

Relator responds that she has adequately pleaded presentment with particularity to overcome Defendants' motion to dismiss. The most direct way to satisfy the presentment requirement is "by identifying specific claims submitted to the government: invoices, billing records, reimbursement forms." *Vargas v. Lincare, Inc.*, 134 F.4th 1150, 1157 (11th Cir. 2025) (citing *Hopper*, 588 F.3d at 1326). The Eleventh Circuit has held, however, that "Rule 9(b) does not always require documentary proof at the pleading stage." *Vargas*, 134 F.4th at 1157. The key is whether the allegations of

presentment include "sufficient indicia of reliability." *Id.* (citing *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1357–58 (11th Cir. 2006)). This determination depends on context and is analyzed on a case-by-case basis. *Vargas*, 134 F.4th at 1157 (citing *Atkins*, 470 F.3d at 1358).

In *Atkins*, the Eleventh Circuit found that a relator psychiatrist's allegations of submissions of false claims fell short where the relator alleged he suspected his employer of submitting false claims and identified patients and procedures he thought should not be reimbursable, but he had no role in billing, no personal knowledge of claims submitted, and the allegations rested on his own opinions and staff rumors. *Atkins*, 470 F.3d at 1359.

In contrast, in *U.S. ex rel. Walker v. R&F Properties of Lake County, Inc.*, 433 F.3d 1349 (11th Cir. 2005), the Eleventh Circuit found the allegations in a relator's complaint to be sufficiently reliable to overcome a motion to dismiss where relator alleged that she was a nurse practitioner who worked for defendant, while employed she never had her own billing code to use, she was instructed each day as to "which doctor she would be billing under," that her services were always billed "incident to the service of a physician" and never as an independent service, and that she discussed this practice with the office administrator who indicated they never billed nurse practitioner or physician assistant services in another manner. *Id.* at 1360. Affirming the district court's denial of the motion to dismiss, the appellate court concluded that these allegations were sufficient to explain why relator believed defendant submitted

14

false or fraudulent claims for services rendered by nurse practitioners and physician assistants "incident to the service of a physician." *Id.*

"At the motion-to-dismiss stage, we take the plaintiff's well-pleaded allegations as true . . . and draw all reasonable inferences in the relators' favor." *Vargas*, 134 F.4th at 1159 (citing *Iqbal*, 556 U.S. at 678–79). "That does not change in FCA cases." *Id.* at 1159. As the *Vargas* court explained, the "question is not whether the relators have proved fraud; it is whether they have alleged it with particularity." *Id.*

Here, Relator's allegations in Count I provide sufficient indicia of reliability. She attaches a representative sample (patient notes and billing for Patient 60) showing that claims were actually submitted to the government. Doc. 111 ¶¶ 101–106, 114–117. She alleges the basis of her first-hand knowledge of and access to Defendants' billing systems. *Id.* ¶¶ 113, 130. And she details her internal audits of Defendants' billing practices. *Id.* ¶¶ 118-128. The billing entry for Patient 60 was retrieved from Defendants' EMR system that Relator had training on and that included billing and claims information. The billing entry also showed Medicare paid Defendants for physical therapy services provided to Patient 60. The representative claim included the amounts charged, who submitted the claims, the dates of submission, the CPT codes used and services Defendants charged for, the dates Medicare paid, the identity of the payment processor who paid Defendants, and the break-down of the treatment that Ms. Booth provided versus what was billed.[2] *Id.* The Court may appropriately consider

---

[2] Defendants submit that the PS Inquiries are not claims, bills, nor a remittance advice and how discounts are applied to these charges is unknown. Doc. 116 at 12. Further, Defendants

the documents attached to the Third Amended Complaint. *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). Relator's allegations and exhibits satisfy the who, what, where, when, and how of fraudulent submissions, *see Olhausen v. Arriva Med., LLC*, 124 F.4th 851, 860 (11th Cir. 2024), to state with particularity a violation of § 3729(a)(1)(A).

Defendants additionally contend that Relator fails to allege falsity with particularity. First, Defendants argue that because Relator fails to include the corresponding PS Inquiries for the other patients (Patients 81 and 82) treated on the same dates and times as Patient 60 that Relator is unable to establish the falsity of the claims submitted on behalf of Patient 60. This argument is unavailing. Accepting Relator's allegations as true and drawing all reasonable inferences in her favor, *see Vargas*, 134 F.4th at 1159, Defendants billed the Government for providing direct therapy (i.e., one-on-one) services to Patient 60 when she was being treated simultaneously with other patients (i.e., group therapy). Regardless of the CPT codes and units listed on the PS Inquiries for Patients 81 and 82, Relator's allegations sufficiently allege the falsity of *Patient 60's* bills.

Next, Defendants argue that the lack of PS Inquiries for Patients 81 and 82 deprive the Court of insight into any charge reversals which would undermine

---

contend that Relator self-created the summary therapy charts, and they contain inconsistencies. *Id.* at 11-12. At this juncture, the Court accepts the well-pleaded allegations as true, drawing all reasonable inferences in Relator's favor. On the upcoding theory, Relator has come forward with adequate factual allegations and exhibits to provide sufficient indicia of reliability to support her FCA claims in Counts I, II, and III to survive the motion to dismiss. These are arguments Defendants certainly can raise in defense of the claims.

Relator's allegations of falsity and the claim that the Government overpaid. While that may be the case, Defendants' argument, which goes beyond the four corners of the Third Amended Complaint, is more appropriately raised as a defense and does not support dismissal at this juncture.

Defendants' third argument similarly fails for arguing matters beyond the complaint. Specifically, Defendants argue that Relator fails to account for alternative explanations that would reflect lawful conduct in connection with the services provided to patients 60, 80, and 81, such as a situation in which a physical therapy assistant (PTA) provides the one-on-one care to a patient under the supervision of a physical therapist who is providing one-on-one therapy at the same time to a different patient. In support, Defendants contend that it was not until 2020 that Medicare introduced the CQ modifiers to specifically identify services provided by PTAs, which means services provided by a PTA would not appear on a PS Inquiry for dates of service prior to 2020. Doc. 116 at 17 n.6. Defendants argue that the Court may infer from the factual allegations obvious alternative explanations. But, as Relator argues, whether a PTA helped Ms. Booth treat Patients 60, 80 and 81 without being referenced in the medical notes is not necessarily an "obvious alternative explanation." In any event, Defendants' argument is again more appropriate to raise as a defense on a more fully developed record and not as a basis for dismissal.

2.    Count II—Violation of 31 U.S.C. § 3729(a)(1)(B)

Count II seeks to hold Defendants liable for presenting to the Government false records or statements with documented upcoding that are material to the alleged

fraudulent claims. *See* Doc. 111 ¶ 193. She alleges the false records or statements submitted were material to Defendants' claims for payment because Medicare would not have paid the claims absent the records or statements. *Id.* ¶ 193 A party is liable under § 3729(a)(1)(B) if it "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). Defendants move to dismiss Count II arguing Relator fails to identify with particularity a single false claim for Patient 60 or any other patient; she fails to identify or attach to her complaint a false certification by Defendants; and certifications in a Provider Agreement to "comply with all federal laws" are insufficient to establish a false certification. Defendants submit it is not surprising that Relator fails to identify a single Medicare cost report because none of the clinics identified are required to submit Medicare cost reports. Instead, Medicare reimburses providers furnishing outpatient therapy services based on a physician fee schedule, rather than a provider's costs. Relator responds that "cost reports" are irrelevant because any false certification by Defendants is sufficient to state a claim under § 3729(a)(1)(B) and she alleges these certifications.

To properly state a "make-or-use" claim under § 3729(a)(1)(B), a relator must show that "(1) the defendant made (or caused to be made) a false statement, (2) the defendant knew it to be false, and (3) the statement was material to a false claim." *Phalp*, 857 F.3d at 1154 (citing 31 U.S.C. § 3729(a)(1)(B)). Under the FCA, "the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Universal Health Servs., Inc. v. United*

18

*States*, 579 U.S. 176, 192–93 (2016) (citing 31 U.S.C. § 3729(b)(4)). In a claim brought under subsection (a)(1)(B), the relator must plead that a false claim was actually submitted to the government. *See Olhausen*, 124 F.4th at 863 (clarifying that the presentment requirement is included in the *Phalp* court's third element that the "statement was material to a false claim").

For the same reasons discussed in the section above regarding Count I, *see* Section III(B)(1), the Court concludes that Relator has adequately alleged presentment in Count II. Regarding Defendants' certifications, Relator submits that she has alleged the existence of Defendants' false certifications in Defendants' Medicare Provider Application, contracts with HHS-CMS, its TRICARE/CHAMPUS "requests for reimbursement," cost reports, and annual attestations. Doc. 119 at 14 (citing Doc. 111 ¶¶ 23-29, 171–178). She argues that a provider falsely certifying that it "would comply with all Medicare laws and regulations" was enough to state a violation of § 3729(a)(1)(B). Doc. 119 at 15 (citing *U.S. ex rel. Heesch v. Diagnostic Physicians Grp., P.C.*, No. CIV.A. 11-0364-KD-B, 2014 WL 2154241, at *9 (S.D. Ala. May 22, 2014)). Further, she alleges that the certifications, which were false, were made to obtain payments from the Government. Doc. 111 ¶¶ 176-178.

Defendants' argument that Relator's claim fails because Defendants do not actually submit Medicare cost reports, and instead reimbursed based upon a physician fee schedule, is unpersuasive as Defendants do not direct the Court to any authority that Medicare cost reports are the only form of false record or statement to support a claim under § 3729(a)(1)(B).

Courts in this Circuit have found that a provider certifying compliance with Medicare laws and regulations was sufficient to allege an FCA violation. *See, e.g.*, *Heesch, supra*; *U.S. ex rel. Osheroff v. Tenet Healthcare Corp.*, No. 09-22253-CIV, 2013 WL 1289260, at *3 n.1 (S.D. Fla. Mar. 27, 2013) (finding "Medicare Provider Participation Agreement and annual cost reports are enough to ground liability under the False Claims Act"). Defendant, relying on a California case, argues that representations in a Medicare Provider Agreement that a provider will comply with all federal laws are too general to support a finding of a false certification. Doc. 116 at 20 (citing *U.S. ex rel. Gonzalez v. Planned Parenthood of L.A.*, No. 05cv-8818-AHM (FMOx), 2012 U.S. Dist. LEXIS 88495 at *20–21 (C.D. Cal. Jun. 26, 2022)). Neither party directs the Court to Eleventh Circuit precedent that squarely addresses the issue, and the Court has found none. However, it is clear that "[t]he [FCA] does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." *Clausen*, 290 F.3d at 1309. However, here, Relator alleges Defendants made false certifications in their Medicare Provider Application, contracts with HHS-CMS, TRICARE/ CHAMPUS "requests for reimbursement," cost reports, and annual attestations. She alleges with particularity the false claims submitted based on the upcoding theory and that they were material to obtaining reimbursement from the Government. In a light favorable to Relator, she adequately alleges with particularity a claim for violation of § 3729(a)(1)(B).

3.    Count III—Violation of 31 U.S.C. § 3729(a)(1)(G)

Count III asserts a claim against Defendants for their failure to report and return overpayments to the Government in violation of § 3729(a)(1)(G). "This is known as the 'reverse false claim' provision of the FCA because liability results from avoiding the payment of money due to the government, as opposed to submitting to the government a false claim." *U.S. ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012). Relevant to Relator's claim in Count III, reverse false claims liability attaches when a person "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government[.]" 31 U.S.C. § 3729(a)(1)(G).

Defendants argue that Relator's "reverse false claims" theory turns on whether Defendant submitted false claims or records in the first instance. As an initial matter, presentment of a false claim or statement is not at issue in a reverse false claims action. *See Matheny*, 671 F.3d at 1224 n.12. But even still, the Court has concluded above that Relator sufficiently identifies the submission of such false claims and statements with particularity. Next, Defendants argue that Relator has not alleged facts to support the inference that Defendant knowingly concealed an overpayment or improperly retained money received from a false claim. Review of the Third Amended Complaint's allegations defeats Defendants' argument. Relator alleges Defendants falsely certified the accuracy of its fraudulent claims in its cost reports and annual attestations (Doc. 111 ¶¶ 23–29); she brought Ms. Booth's fraudulent billing to the attention of the Market Manager, Rudy Maduro (Doc. 111 ¶¶ 161–162); and rather than Defendants

21

conducting a full chart review of Booth's activity or have Booth make an addendum to all the billing entries, Relator was told to stop auditing other treating clinician's patient documentation. (Doc. 111 ¶¶ 163–165). Relator alleges that Defendants submitted the false claims despite her providing Defendants with notice of the unlawful billing practices (Doc. 111 ¶ 168). Finally, she alleges that in Defendants' annual Medicare cost reports and attestations certifying compliance with Medicare requirements, Defendants concealed and avoided their obligation to repay the Government for the upcoded fraudulent charges. (Doc. 111 ¶ 198). Count III adequately alleges a reverse false claim based upon the upcoding theory.

### C. Unskilled Services Theory

In Counts IV, V, and VI, Relator sues Defendants based on a theory that Defendants fraudulently billed the Government for unskilled services in which the amount, frequency, or duration of treatment was unreasonable and therefore ineligible for reimbursement. Under Medicare rules, "no payment may be made under part A or part B for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).

In their motion to dismiss, Defendants contend that Relator's "unskilled services" theory hinges on claims Defendants submitted for unskilled services performed on two patients insured by Medicare Advantage Organizations (MAO). Defendants first argue that Relator waived any claims submitted to MAOs. This argument, which is based on Relator's representations in her response to the motion

to dismiss the Second Amended Complaint, is without merit. Relator responds that her reference (in response to the motion to dismiss the Second Amended Complaint) to not alleging MAO fraud related only to her upcoding allegations. She never limited her "unskilled services" allegations in this manner. Regardless, the Third Amended Complaint is the operative complaint and the fact that MAO-insured patients may not have been the subject of the Second Amended Complaint is irrelevant on the instant motion.

Defendants next argue that Relator's "unskilled services" claims implicate only MAO payors and are not actionable under the FCA on the facts alleged. In response to Defendants' motion, the Government filed a Statement of Interest. Doc. 129.  In explaining the role of MAOs, the Government states:

> Under Medicare Advantage, the Centers for Medicare & Medicaid Services ("CMS") contracts with private insurance carriers—called Medicare Advantage Organizations, or MAOs—to provide Medicare beneficiaries with coverage for the types of medical services they would otherwise receive under the traditional Medicare program. *See Cares Cmty. Health v. U.S. Dep't of Health & Hum. Servs.*, 944 F.3d 950, 953 (D.C. Cir. 2019); *see generally* 42 U.S.C. §§ 1395w-21 to -28. Eligible individuals can opt out of Traditional Medicare (Parts A & B) and enroll in Medicare Advantage (Part C) plans offered by MAOs. The Medicare Advantage Organizations administer the federal Medicare benefits for beneficiaries enrolled in their plan in return for payments from CMS, which are disbursed on a monthly, capitated (per beneficiary, not per service) basis. *See* 42 U.S.C. § 1395w-23. With certain defined exceptions, Medicare Advantage plans must provide the same coverage as traditional Medicare. 42 C.F.R. § 422.101(a) (requiring that Medicare Advantage plans "[p]rovide coverage of … all services that are covered by Part A and Part B of Medicare").

23

Doc. 129 at 3–4. While not taking a position on the overall merit of Defendants' motion, the Government takes issue with any suggestion by Defendants that Relator's unskilled services claims are not actionable under the FCA because MAOs are private non-governmental health insurance companies, not federal payors. *Id.* at 4–5. In response, Defendants contend they never made the argument that claims submitted by a provider to an MAO cannot give rise to FCA liability. Rather, Defendants argue that Relator failed to adequately plead facts to support her unskilled services counts.

Indeed, the term "claim" is defined broadly enough under the FCA to include requests or demands for payment "made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest," 31 U.S.C. § 3729(b)(2)(A)(ii), which would certainly include MAOs. In their motion, Defendants argue, however, that Relator fails to allege facts to show any purported false diagnosis submitted had an impact on CMS's determination of the monthly capitated premium payments. The United States addresses this issue in its Statement of Interest explaining that "[u]nder Medicare's payment structure, CMS makes capitated payments to MAOs, which in turn disburse payments to medical providers and other downstream entities such as Defendants. Thus, Defendants could be liable if their false statements were material to the payment or receipt of either (1) CMS's capitated payments to the MAOs, or (2) the payment by the MAOs to Defendants for services provided to Medicare beneficiaries." Doc. 129 at 10. The Relator does not directly address the issue, instead responding only that the

two MAO examples provided did not limit her unskilled services theory to only MAO patients. As the Government points out, payment by the MAOs to Defendants for services would suffice if Relator's allegations regarding such payments satisfy Rule 9(b). Regardless of whether her unskilled services theory is alleged as to the two MAO patients or others, the allegations fall short for the reasons discussed below.

As Defendants argue in their motion to dismiss, Relator has not alleged with requisite particularity the presentment of a claim or knowing retention of an overpayment, to support her claims under §§ 3729(a)(1)(A), 3729(a)(1)(B), and 3729(a)(1)(G) based on an "unskilled services" theory. The Court previously dismissed Relator's FCA claims based on the unskilled services theory for failing to sufficiently allege with particularity factual allegations to support an actual false claim submitted to the government for payment. Doc. 107 at 18–19. While the Third Amended Complaint has corrected some of the deficiencies in her claims by attaching treatment notes for two exemplar patients, Relator still fails to provide any details regarding the actual presentment of the claims for payment. This failure is fatal to her unskilled services claims under §§ 3729(a)(1)(A) and 3729(a)(1)(B).

As Relator is aware, the presentment of a claim is the *sine qua non* of a False Claims Act violation. *Clausen*, 290 F.3d at 1311. Yet, she does not allege any specific billing information, or even provide summaries such as the PS Inquiries she submits in support of her upcoding claims. In short, her allegations of presentment fall short of providing the indicia of reliability that this Circuit requires to overcome a motion to

25

dismiss.[3] Relator argues that she has alleged her personal knowledge of Defendants' EMR, coding, and billing. But, unlike with the upcoding counts, Relator's unskilled services counts do not take that necessary next step of alleging sufficient factual allegations to show specific claims were actually presented to and paid by the government.[4] Accordingly, her claims in Counts IV and V fail.

Although presentment is not required for a reverse false claim under § 3729(a)(1)(G), Count VI fares no better because it too fails to satisfy the particularity requirements of Rule 9(b). As previously stated, to satisfy this heightened-pleading standard in an FCA action, a relator must allege "facts as to time, place, and substance of the defendant's alleged fraud," particularly, "the details of the defendants' allegedly

---

[3] Defendants also argue Relator's claims are insufficient to allege "falsity" because it is only Relator's subjective opinion, without more, that unreasonable services were provided to the two patients. Doc. 116 at 26. For example, for the elderly patient who received 161 physical therapy sessions in 21 months, that would equate to less than 2 visits per week. Defendants argue that it is pure speculation that such course of treatment is per se unreasonable. Additionally, Defendants argue Relator's allegations ignore that CMS expressly recognizes the availability of Medicare coverage for "skilled therapy services related to a reasonable and necessary maintenance program," such as when the goal is to "maintain functional status or to prevent or slow further deterioration in function." Doc. 116 at 26 (citing Medicare benefits Policy Manual, Chapter 15, § 220.2(D)). Citing *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1296–97 (11th Cir. 2019), Defendants argue that a "claim cannot be 'false'—and thus cannot trigger FCA liability—if the underlying clinical judgment does not reflect an objective falsehood." The *AseraCare* case involved the Medicare statute pertaining to hospice treatment, which is not at issue here, and *Aseracare* was before the court on summary judgment. Thus, even if the unskilled services claims survived, Defendants' falsity arguments would be more appropriately raised on summary judgment.

[4] For example, in support of her upcoding counts, Relator alleges that specific fraudulent charges were presented to and paid by the government, and she attaches billing information. *See* Doc. 111 ¶ 82; Doc. 110-2. Although the PS Inquiries are not claims or bills, they did provide, along with her factual allegations, sufficient indicia of reliability. No comparable allegations, PS Inquiries, or similar documentation was provided as to the unskilled services counts.

fraudulent acts, when they occurred, and who engaged in them." *Clausen*, 290 F.3d at 1310. Review of the allegations of Count VI reveals Relator fails to plead with the particularity as required by Rule 9(b) that Defendants knowingly concealed an overpayment or improperly retained money received from a false claim as it relates to her unskilled services theory. Defendants' motion to dismiss as to Counts IV, V, and VI is due to be granted.

### D. Nationwide Claim

Defendants request dismissal under Rule 9(b) of a nationwide scheme. Specifically, Defendants posit that although Relator only alleges improper claims associated with one clinic in Tampa, she includes allegations that she gave notice to Defendants "on a local, regional, and national basis." Defendants argue the factual allegations do not exist to support a nationwide scheme and her fleeting attempt to expand the scope of the Third Amended Complaint into a national case does not withstand minimal scrutiny.

In response, Relator claims she has adequately pleaded a nationwide scheme based on her detailed allegations and she submits that Defendants' motion is a dubious attempt to limit her discovery.

The motion before the Court is a motion to dismiss and is not a motion related to the scope of discovery. The Court did not and does not read the Third Amended Complaint to raise a "nationwide" case involving Defendants' 1900 clinics spanning 39 states. The allegations of the Third Amended Complaint brought by a former

employee of one of Defendants' Tampa area clinics[5] and asserting specific allegations only as to the clinics in the metro-Tampa area does not plead FCA claims against all of Defendants' clinics across the nation. The specific allegations related to an upcoding scheme that the Court found to be pleaded with particularity pertain only to the Tampa area clinics. Thus, to the extent that Relator intended the Third Amended Complaint to state FCA claims nationwide, the allegations fail under Rule 9(b). While Relator alleges her personal knowledge of Defendants' systems and processes based on her training, experience and interaction with other employees and management, there are no allegations about how the other clinics outside the Tampa area are run or managed. The Third Amended Complaint is void of any specific factual allegations about any other clinic outside Tampa, their patients, their billing, or their medical records. In sum, the Third Amended Complaint clearly only addresses the Tampa area clinics. Relator cannot amend her complaint by way of her response to the motion to dismiss. And, as Relator has now had four opportunities to plead her claims, no further amendment will be permitted. However, to the extent that nationwide claims were intended to be a part of the Third Amended Complaint, such claims are dismissed without prejudice.[6]

    Accordingly, it is

---

[5] Relator's allegations reflect she worked for approximately a year from July 2014 until August 2015 for one of Defendants' clinics in Cromwell, Connecticut (Doc. 111 ¶ 2). However, that was over ten years ago and none of her factual allegations in the Third Amended Complaint discussing patients, their treatment, or the submission and payment of claims reference the Connecticut clinic or any other clinic outside the Tampa, Florida, area.

[6] This Order makes no ruling regarding the scope of discovery.

**ORDERED**:

1.    Defendants' Motion to Dismiss Relator's Third Amended Complaint (Doc. 116) is **granted in part** and **denied in part**.

2.    Counts IV, V, and VI of the Third Amended Complaint are **dismissed with prejudice**. To the extent that Relator intended to allege "nationwide" claims against Defendants related to clinics outside the metro-Tampa, Florida, area, such claims are **dismissed without prejudice, without leave to amend in this case**.  In all other respects, the motion is **denied**.

3.    Within **14 days**, Defendants shall file an Answer to Counts I, II, and III of the Third Amended Complaint.

4.    The stay of discovery is **lifted**. Within 14 days, the parties shall confer and file an amended case management report. Upon receipt of the amended proposed deadlines, the Court will issue an Amended Case Management and Scheduling Order.

**DONE AND ORDERED** in Tampa, Florida on March 23, 2026.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record
Unrepresented Parties, if any